## Case No. 9,583.

### MILLER v. McQUERRY.

[5 McLean, 469; [1] 10 West. Law J. 528.]

Circuit Court, D. Ohio. Sept., 1853.

SLAVERY—HOW CREATED—HOW RECOGNIZED—FUGITIVE SLAVES—RECLAMATION—HOW PROVIDED FOR—TRIAL BY JURY—PRESUMPTIONS.

1. Slavery is a municipal regulation; is local; and can not exist without the authority of law. But it need not be shown that it is created by express enactment. It may arise from long recognized rights, countervened by no legislative action. African slavery is thus recognized in Kentucky, and the judges of the supreme court of the United States, whose jurisdiction is co-extensive with the country, are bound to take judicial notice of its existence in those states where it prevails.

2. The constitution of the United States did not leave the enforcement of the provisions for the reclamation of slaves with the states. It vested that power in the government of the United States. This doctrine was affirmed by the supreme court of the United States in Prigg v. Pennsylvania, 16 Pet. [41 U. S.] 539, has been denied by no respectable state court, and has been sustained by the action of the legislative department of the government.

3. In proceedings, under the fugitive slave law, the inquiry is not strictly whether the fugitive be a slave, or a freeman, but whether he owe service to the claimant. The decision, upon that question, is no bar to an inquiry in the proper tribunal, as to the personal status of the fugitive. The examination is preliminary, and not a final adjudication.

4. The seventh amendment to the constitution, preserving the right of trial by jury in all suits at common law, where the value in controversy exceeds twenty dollars, does not apply to an examination as to the claim for services under this law. Such an examination is not a proceeding at common law, but a statutory one.

5. The presumption of freedom attaches to every resident of a free state, without regard to color; and on the same principle, in a slave state, every colored man is presumed to be a slave.

6. It is not necessary, under the act of 1850 [9 Stat. 462], to produce the record showing the status of the fugitive in another state. The fact that he owes service may be established by other, and oral testimony.

Mr. Ware, for claimant.
Messrs. Joliffe and Birney, for fugitive.

OPINION OF THE COURT. An affidavit being made on the 16th day of August, 1853, that George McQuerry was illegally imprisoned, he was brought before McLEAN, Circuit Justice, that the cause of his detention

[1] [Reported by Hon. John McLean, Circuit Justice.]

might be inquired into. The plaintiff, as above stated, objected to the discharge of McQuerry, on the ground that he was held by him as a fugitive from labor. After the evidence was heard, and the facts relied on by defendant's counsel were admitted by the plaintiff; and after the counsel on both sides had argued the facts, and the law of the case, the judge proceeded to give his opinion.

After stating how the cause came before him, he observed, "The right of the claimant to the services of the defendant is the first point to be examined. If the claim as made has been proved, then the detention is not illegal."

Jacob Miller, the son of the claimant, was first examined. He is twenty-one years of age. His father resides in Washington county, Kentucky. He has known the fugitive ever since he can remember, as the slave of his father. A little more than four years ago, he absconded from the service of his father, in company with three others, who were also the slaves of his father. The mother of the fugitive came to his father through the mother of the witness. The fugitives were advertised shortly after they absconded, and a reward of four hundred dollars was offered for their return. They were pursued by different persons, but were not overtaken. One of them was arrested, at Louisville, and returned, but shortly after he again absconded. When Wash., as the fugitive was generally called, was lately arrested, at Troy, in Ohio, he said nothing about being free, but observed that he had no intention to run off an hour before he started; that he was persuaded to do so by Steve, one of the individuals who accompanied him.

William Kelly—Is twenty-three years old, lives in the same county of Washington, within two and a half miles of the claimant, and for nine or ten years has known Wash. to be the servant of the claimant. He lived with the complainant as his other slaves, and was subject to his control. He ran away from his master better than four years ago. Was present when Wash. was arrested near Troy a day or two ago. Wash., at first, did not recognize him, but did so after a little conversation. He told the witness that he was sorry he left Kentucky; did not intend to go an hour before he left, and that he was persuaded to leave by Steve.

James Kelly—Aged twenty-eight years; is brother of the above witness. Has known Wash. eleven years as the slave of the claimant. He corroborates the statements of the preceding witness as to the absconding of Wash., that he was advertised, admitted the right of his master, as stated by the other witnesses.

Isaiah Yoker—Lives in the same county, has known Wash. as the slave of the complainant twelve or thirteen years. He corroborates the other statements made by the witnesses examined before him.

Mr. Trader—Is a deputy marshal, and re-

sides at Dayton. He arrested the fugitive, who said that the claimant was his master, and that he had always been well treated.

Mr. Black—Is also a deputy marshal. He heard Wash. say that the claimant was his master, and that he had been well treated. That he had been persuaded to run away.

As a matter against the right of the claimant it is admitted, that the defendant has resided four years in Ohio, and conducted himself well. being considered as a free man.

From the facts proved, there can be no doubt that the fugitive, under the laws of Kentucky, is the slave of the claimant, and that he absconded from his service a little more than four years ago. The testimony is clear on this point. No attempt has been made to controvert the facts, or to impeach the credibility of the witnesses. Of the many cases my judicial duties have required me to examine, where damages were claimed for aiding the escape of fugitives from labor, no case has been proved with more distinctness and fullness than this one. No one capable of comprehending evidence can doubt, that the fugitive lived with the claimant, as his slave, for many years, and that he left that service, without the leave of his master, several years ago.

No proof, it is contended, has been offered to show that Kentucky is a state in which slavery is authorized by law. And a discussion in the senate of the United States is referred to, in which certain senators declared that there was no law in the South expressly establishing slavery. It is with regret that I hear this argument relied on in this case. It was used by gentlemen of the South, to justify the introduction of slavery into our territories, without the authority of law. In Groves v. Slaughter, a Mississippi case, reported in 15 Pet. [40 U. S.] 450, the supreme court of the United States declared, that slavery was local, and that it could not exist without the authority of law. That it was a municipal regulation. Whether this law was founded upon usage, or express enactment, is of no importance. Usage of long continuance, so long that the memory of man runneth not to the contrary, has the force of law. It arises from long recognized rights, countervened by no legislative action. This is the source of many of the principles of the common law. And this for a century or more may constitute slavery, though it be opposed, as it is, to all the principles of the common law of England. I speak of African slavery. But such a law can only acquire potency by long usage. Now it may be admitted that in some of the Southern states, perhaps in all of them, there can not be found a statute which contains the words, "And be it enacted that slavery shall exist;" and this was what was denied in the senate. But this does not shake the decision of the supreme court, above referred to. Usage, of great antiquity, acquires the force of law. The denial, therefore, that slavery existed by

virtue of an express law, or by statute law, which was intended to be denied, was no denial at all. But no usage can acquire the force of law, except it has been long recognized as the basis of action, and as the principle on which the rights of property are maintained.

There is no slave state, where the existence of slavery is not recognized and maintained, by numerous statutes and judicial decisions. The statute books of the South are full of such enactments. The relation of master and slave is fully recognized, and, to some extent, regulated. The decision of the supreme court above referred to settles a most important principle. And I have no regrets that I was the means of inducing that decision. It gives the proper limitation to slavery. It can not be extended beyond the jurisdiction of the states sanctioning it, and can not, legally, be affected by the legislative action of any free state. The principle, I believe, was sanctioned by the southern states, and was not controverted by any non-slaveholding state. On the question of slavery in our territories, this doctrine was first departed from. The supreme court has long since held that that court and its judges recognize, without proof, the laws of the several states and territories. The jurisdiction of that court, and of its members, extends throughout the Union. In the respective states they administer the local laws, so that the laws of the states come under their special cognizance in acting upon individual rights. Kentucky is a slave state. Except in regard to land titles, no other subject has been more productive of legal controversy than contracts arising out of slavery.

It is contended that the law authorizing the reclamation of fugitives from labor is unconstitutional. That the constitution left the power with the states, and vested no power on the subject in the federal government. This argument has been sometimes advanced, and it may have been introduced into one or more political platforms. In regard to the soundness of this position, I will first refer to judicial decisions. In the case of Prigg v. State of Pennsylvania, 16 Pet. [41 U. S.] 539, the judges of the supreme court of the United States, without a dissenting voice, affirmed the doctrine, that this power was in the federal government. A majority of them held that it was exclusively in the general government. Some of the judges thought that a state might legislate in aid of the act of congress, but it was held by no one of them, that the power could be exercised by a state, except in subordination of the federal power. Every state court which has decided the question, has decided it in accordance with the view of the supreme court. No respectable court, it is believed, has sustained the view that the power is with the state. Such an array of authority can scarcely be found in favor of the construction of any part of the constitution,

which has ever been doubted. But this construction, sanctioned as it is by the entire judicial power, state as well as federal, has also the sanction of the legislative power.

The constitution of the United States, it will be observed, was formed in 1787. Afterwards it was submitted to the respective states for their ratification. The subject was not only largely discussed in the federal convention, but also in every state convention. No question has ever arisen, in regard to our federal relations, which was of equal importance to that of the adoption of the constitution; none in our political history was more thoroughly discussed. The men of that day may be emphatically said to have understood the constitution. In a very few years after the constitution was adopted by the states, the fugitive act of 1793 [1 Stat. 302] was passed. That law is still in force, except where the act of 1850 contains repugnant provisions. In the congress which enacted the act of 1793, it is believed, that some of the members had been members of the convention. They could not have been ignorant of the provision of that instrument. And by the passage of that act they exercised the power, as one that belonged to the federal government. Here is a force of authority, judicial and legislative, which can not be found on any other seriously litigated point in the constitution. Such a weight of authority is not to be shaken. If the question is not to be considered authoritatively settled, what part of that instrument can ever be settled? The surrender of fugitive slaves was a matter deeply interesting to the slave states. Under the confederation there was no provision for their surrender. On the principles of comity amongst the states the fugitives were delivered up; at other times they were protected and defended. This state of things produced uneasiness and discontent in the slave states. A remedy of this evil, as it was called, was provided in the constitution.

An individual who puts his opinion, as to the exercise of this power, against the authority of the nation in its legislative and judicial action, must have no small degree of confidence in his own judgment. A few individuals in Massachusetts may have maintained, at one time, that the power was with the states; but such views were, it is believed, long since abandoned, but they are reasserted now, more as a matter of expediency than of principle. But whether we look at the weight of authority against state power as asserted, or at the constitutional provision, we are led to the same result. The provision reads: "No person held to service or labor in one state, under the laws thereof, escaping into another, shall in consequence of any law or regulation therein, be discharged from such service or labor; but shall be delivered up on claim of the party to whom such service may be due." This, in the first place, is a federal measure. It was

adopted by the national convention, and was sanctioned as a federal law, by the respective states. It is the supreme law of the land. Now a provision which can not be enforced, and which has no penalty for its violation, is no law. The highly respectable gentleman who read an ingenious argument in support of these views, is too good a theologian to contend that any rule of action which may be disregarded without incurring a penalty, can be law. It may be a recommendation, but it can not be a law. This was the great objection to the articles of confederation. There was no power to enforce their provisions. They were recommendatory, and without sanctions. There is no regulation, Divine or human, which can be called a law, without a sanction. Our first parents, in the garden, felt the truth of this. And it has been felt by violators of the Divine or human laws throughout the history of our race.

The provision in the constitution is prohibitory and positive. It prohibits the states from liberating slaves which escape into them, and it enjoins a duty to deliver up such fugitives on claim being made. The constitution vests no special power in congress to prohibit the first, or to enforce the observance of the second. Does it, therefore, follow that effect can be given to neither, if a state shall disregard it? Suppose a state declares a slave who escapes into it shall be liberated, or that any one who shall assist in delivering him up shall be punished. If this power belongs to the states, and not to the federal government, these regulations would be legal, as within the exercise of their discretion. This is not an ideal case. The principle was involved in the Prigg Case, and the supreme court held the act of the state unconstitutional and void. It is admitted that there is no power in the federal government to force any legislative action on a state. But, if the constitution guarantees a right to the master of a slave, and that he shall be delivered up, the power is given to effectuate that right. If this be not so, the constitution is not what its framers supposed it to be. It was believed to be a fundamental law of the Union. A federal law. A law to the states and to the people of the states. It says that the states shall not do certain things. Is this the form of giving advice or recommendation? It is the language of authority, to those who are bound to obey. If a state do the thing forbidden, its act will be declared void. If it refuse to do that which is enjoined, the federal government, being a government, has the means of executing it. The constitution provides, "that full faith shall be given to public acts, records, and judicial proceedings," of one state in every other. If an individual claims this provision as a right, and a state court shall deny it, on a writ of error to the supreme court of the Union, such judgment would be reversed. And the provision is that "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." Congress unquestionably may provide in what manner a right claimed under this clause, and denied by a state, may be enforced. And if a case can be raised under it, without any further statutory provisions, so as to present the point to the supreme court, the decision of a state court, denying the right, would be reversed. So a state is prohibited from passing a law that shall impair the obligations of a contract. Such a law the supreme court has declared void. In these cases, and in many others, where a state is prohibited from doing a thing, the remedy is given by a writ of error, under the legislation of congress. The same principle applies in regard to fugitives from labor.

A fugitive from justice may be delivered up under a similar provision in the constitution. It declares that, "a person charged in any state with treason, felony, or other crime, who shall flee from justice, and be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime." This is contained in the same section as the clause in relation to fugitives from labor, and they both stand upon the same principle. In both cases congress has provided a mode in which effect shall be given to the provision. No one, it is believed, has doubted the constitutionality of the provision in regard to fugitives from justice. The men who framed the constitution, were adequate to the great duties which devolved upon them. They knew that a general government was essential to preserve the fruits of the Revolution. They understood the necessities of the country. The articles of confederation had been found as a rope of sand, in all matters of conflict between the different states, and the people of the different states. Without a general government, commerce could not be regulated among the states, or with foreign nations; fugitives from labor could not be reclaimed; state boundaries could not be authoritatively established. I am aware it has been stated, that the subject of slavery was not discussed in the convention, and that the reclamation of fugitives from labor was not, at that time, a subject of much interest. This is a mistake. It was a subject of deep and exciting interest, and without a provision on the subject no constitution could have been adopted. I speak from information received from the late Chief Justice Marshall, who was one of the chief actors in that day, than whom no man then living was of higher authority. The want of a general regulation on the subject of fugitives from justice and from labor was felt, and the above provisions in the constitution were intended as a remedy. It has proved to be an adequate remedy as against fugitives from justice. In no instance, it is believed, has the constitutionality of this provision been doubted. But the provision in relation to fugitives from

labor, resting upon the same principle, is now opposed. If the introduction of this provision into the fundamental law of the Union, was not intended to operate as the law of the Union—if it was recommendatory in its character only—it was useless. The power to surrender fugitives from labor, under the confederacy, was with each state. It could be done, or refused, at the discretion of the state. Did the framers of the constitution intend to leave this matter as it was under the confederation? The provision introduced shows an intention to make some provision on the subject. But by the argument, it is said, the provision made left the power with the states, and did not vest it in the general government. The answer to this is, it was in the states before the provision, and on this view, it added nothing to the power of the states. If such be the true construction of the provision, it fixes an act of consummate folly on the framers of the constitution, and on the members of the state conventions who adopted it. In laying the foundation of a general government, they incorporated into the fundamental law a useless provision, and omitted to provide for an emergency which was felt and complained of in one half of the states. The men of that day were not likely to be guilty of such an omission. They understood the federal and state powers too well, not to know that without some effective provision on this subject, the superstructure which they were about to rear would soon be overthrown. These were the circumstances under which the constitution was framed and adopted. With the abstract principles of slavery, courts called to administer this law have nothing to do. It is for the people, who are sovereign, and their representatives, in making constitutions, and in the enactment of laws, to consider the laws of nature, and the immutable principles of right. This is a field which judges can not explore. Their action is limited to conventional rights. They look to the law, and to the law only. A disregard of this, by the judicial powers, would undermine and overturn the social compact. If the law be injudicious or oppressive, let it be repealed or modified. But this is a power which the judiciary can not reach.

The citizen of a slave state has a right, under the constitution and laws of the Union, to have the fugitive slave "delivered up on claim being made," and no state can defeat or obstruct this constitutional right. The judiciary power of the Union has the primary or eventual power to determine all rights arising under the constitution. This will not be controverted by any legal mind, which has properly investigated the great principles of the constitution. And the question now made is not, in principle, different from a numerous class of cases arising under powers prohibited to the states. The worthy and estimable gentlemen who read an argument on this occasion, in commenting on the cases covered by the fugitive law, embraced all cases of contract, and even that between a minister and his congregation. He supposes if the minister should leave his congregation before his stipulated engagement had transpired; that he was liable to be arrested and returned to his congregation under the fugitive law. This is a case, under this law, which no one before has supposed to be embraced by it. And if the law did cover such a case, it would be the most difficult to carry out of any other which has been imagined. If the minister could be returned, neither the court nor the congregation could compel him to preach. No profession or class of men would be less likely to do anything on compulsion. But the law applies to no case of contract. Where the parties to the agreement are capable of making a contract, the remedy for a breach of it is by action at law. In the case of slaves and of apprentices, there is no remedy against the individual who absconds, by an action.

Various objections are stated to the fugitive slave law of 1850. The duties of the commissioners, the penalties inflicted, the bribe secured to the commissioner, for remanding the fugitive, are all objected to as oppressive and unconstitutional. In regard to the five dollars, in addition, paid to the commissioner, where the fugitive is remanded to the claimant, in all fairness, it can not be considered as a bribe, or as so intended by congress; but as a compensation to the commissioner for making a statement of the case, which includes the facts proved, and to which his certificate is annexed. In cases where the witnesses are numerous, and the investigation takes up several days, five dollars would scarcely be a compensation for the statement required. Where the fugitive is discharged, no statement is necessary. The powers of the commissioner, or the amount of the penalties of the act, are not involved in this inquiry. If there be an unconstitutional provision in an act, that does not affect any other part of the act. But I by no means intimate that any part of the act referred to is in conflict with the constitution. I only say that the objections made to it do not belong to the case under consideration.

The act of 1850, except by repugnant provisions, did not repeal the act of 1793. The objection that no jury is given does apply to both acts. From my experience in trying numerous actions for damages against persons who obstructed an arrest of fugitives from labor, or aided in their escape, I am authorized to say, that the rights of the master would be safe before a jury. I recollect an instance where a strong anti-slavery man, called an Abolitionist, was on the jury in a case for damages, but who, being sworn to find as the evidence and the law required, agreed to a verdict for the plaintiff. He rightly determined that his own opinions could not govern him in deciding a controversy between parties, but that under his oath he was bound by the law and the

evidence of the case. It was in the power of congress to give a jury in cases like the present, but the law contains no such provision, and the question raised is, whether the act without it is constitutional. This question has been largely discussed in congress, in the public press, and in conventions of the people. It is not here raised as a question of expediency or policy, but of power. In that aspect only is it to be considered. The act of 1793 has been in operation about sixty years. During that whole time it has been executed as occasion required, and it is not known that any court, judge, or other officer has held the act, in this, or in any other respect, unconstitutional. This long course of decisions, on a question so exciting as to call forth the sympathies of the people, and the astuteness of lawyers, is no unsatisfactory evidence that the construction is correct.

Under the constitution and act of congress, the inquiry is not strictly whether the fugitive be a slave or a freeman, but whether he owe service to the claimant. This would be the precise question in the case of an apprentice. In such a case the inquiry would not be, whether the master had treated the apprentice so badly as to entitle him to his discharge. Such a question would, more probably, arise under the indenture of apprenticeship, and the laws under which it was executed. And if the apprentice be remanded to the service of his master, it would in no respect affect his right to a discharge, where he is held, for the cruelty of his master or any other ground. The same principle applies to fugitives from labor. It is true in such cases evidence is heard that he is a freeman. His freedom may be established, by acts done or suffered by his master, not necessarily within the jurisdiction where he is held as a slave. Such an inquiry may be made, as it is required by the justice of the case. But on whatever ground the fugitive may be remanded, it can not, legally, operate against his right to liberty. That right when presented to a court in a slave state, has, generally, been acted upon with fairness and impartiality. Exceptions to this, if there be exceptions, would seem to have arisen on the claims of heirs or creditors, which are governed by local laws, with which the people of the other states are not presumed to be acquainted. If a fugitive from labor, after being liberated by a judge or commissioner, should voluntarily return to his master, southern courts have held that his original status would attach to him; he would be held as a slave. And, of course, the decision of the judge or commissioner, having been that he did not owe service to the claimant, could not operate as a bar to the rights of the master. The claim to freedom, if made, in the slave state, would be unaffected by the preliminary inquiry and decision. That decision is, that the slave does, or does not, owe service to the claim-

ant. It does not finally establish the fact, whether the fugitive is a freeman or a slave. If the decision on such an inquiry as this, should finally fix the seal of slavery on the fugitive, I should hesitate long, notwithstanding the weight of precedent, without the aid of a jury, to pronounce his fate. But the inquiry is preliminary, and not final. It is true, it may be said, that the power of the master may be so exercised as to defeat a trial for the freedom of the fugitive. This must be admitted, but the hardship and injustice supposed arises out of the institution of slavery, over which we have no control. Under such circumstances, we can not be held answerable.

It may be said that the seventh article in the amended constitution which gives a trial by jury, "where the value in controversy shall exceed twenty dollars," does not apply to a case like this. The provision is, "in suits at common law." This is not strictly a proceeding at common law. The common law is opposed to the principle of slavery. The proceeding is under constitutional and statutory provisions, under the forms specially provided, and not according to the course of the common law.

This is represented to be an ex parte proceeding. It does not bear this character. Had it been represented to me, that the fugitive could produce evidence conducing to prove that he did not owe service to the claimant, time would have been given to procure the evidence. The only allegation, as to what the counsel expected to prove by absent witnesses, was, that the fugitive had resided in Indiana and Ohio four years, and that he was esteemed and considered a freeman. This the counsel for the claimant admitted, and as no further allegation of evidence was alleged to be in the power of the party, of course there was no ground for a postponement. The presumption of freedom attaches to every resident of a free state, without regard to color; and, on the same principle in a slave state, every colored man is presumed to be a slave. But this presumption, in this case, is counteracted by the facts proved.

It is argued, that the evidence is defective, as the record showing the status of the fugitive, as authorized by the act of 1850, is not produced. Such record is not necessary to establish the right of the claimant. If it were produced, the identity of the fugitive would still be an open question. On the question of identity, anything which conduced to prove that the person described in the judgment was not the one before the judge or commissioner, would be admissible.

I am gratified with the gentlemanly bearing and courtesy with which this argument has been conducted. It was due to the occasion and the circumstances. No other course was expected.

Upon the whole, no doubt can exist on the evidence, that the fugitive owes service to

the claimant; and, under the law, I am bound to remand him to the custody of his master, with authority to take him to the state of Kentucky, the place from whence he fled.